**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **KENNETH J. HENNING,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 07 C 5730** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **COMMISSIONER OF SOCIAL** | ) | **Magistrate Judge Morton Denlow** |
| **SECURITY** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Claimant Kenneth J. Henning ("Claimant") seeks reversal or remand of the decision by Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner"), denying Claimant's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). This case presents the following issues: (1) whether substantial evidence supports the decision of the Administrative Law Judge ("ALJ") that the Claimant was not disabled; (2) whether the ALJ erred in considering testimony from the Vocational Expert ("VE") that was allegedly inconsistent with the Dictionary of Occupational Titles ("DOT"); (3) whether the ALJ was required to obtain objective psychological testing and a mental residual functional capacity ("RFC") assessment; and (4) whether the ALJ erred in concluding that Claimant could perform full-time work. For the following reasons, the Court denies Claimant's motion to reverse or remand the final decision of the Commissioner and grants the Commissioner's motion for summary judgment and affirms the Commissioner's

decision that the Claimant was not disabled.

## I. BACKGROUND FACTS

### A. Procedural History

Claimant protectively applied for DIB and SSI on October 27, 2005, alleging a disability onset date of November 10, 2001. R. 143. The Social Security Administration ("SSA") denied his application on February 28, 2006. R. 63-66. Claimant then filed a request for reconsideration, which was also denied on June 30, 2006. R. 67-73. Subsequently, Claimant requested a hearing before an ALJ. R. 76.

On March 1, 2007, ALJ Denise McDuffie Martin presided over a hearing at which Claimant appeared with a non-attorney representative. R. 550-603. Plaintiff's friend and roommate, Cynthia Gill; a medical expert, Daniel Girzadas, M.D.; and a vocational expert, Julie Lynn Bose, also testified at the hearing. On April 24, 2007, the ALJ issued a decision finding Claimant was not disabled and thus not entitled to DIB and SSI because he was able to perform a significant number of jobs in the national economy. R. 18-29. Claimant then filed for a review of the ALJ's decision, and the Appeals Council denied the request by letter dated August 21, 2007. R. 4-17. Therefore, the ALJ's decision became the final decision of the Commissioner. Claimant subsequently filed this action for review pursuant to 42 U.S.C. § 405(g).

### B.     Hearing Testimony - March 1, 2007

## 1.    Kenneth J. Henning - Claimant

As of the hearing, Claimant was forty years old, divorced, and living with his friend, Cynthia Gill.  R. 556-57.  He has a tenth grade education.  R. 557.  Claimant is literate, but he has not received a GED nor any vocational training.  R. 558.

Claimant stated that he has taken medication for a seizure disorder since his late teens, and that his seizures have "lessened" over the years.  R. 559-60, 580-81.  While testifying that he no longer suffered "full blown" grand mal seizures[1], he claimed that he continued to experience episodes in which he would space out for a minute.  R. 559.  This occurred not more than two or three times a month, and lasted five to ten minutes.  R. 575-76, 578; *see* R. 193.  At the time of the hearing, Claimant was taking Neurontin for his seizure disorder.  *Id.*

Claimant testified that his seizure disorder adversely affected his ability to maintain a job.  R. 580.  After he suffered a seizure, he would typically miss work for three to four days and then lose his job.  *Id.*  Claimant's work for more than one or two years as a warehouse production support specialist at Wisconsin Foam and Bag represents his longest tenure at any job.  R. 581.  Claimant had a lot of jobs of only one or two months in duration.  R. 582.

Claimant also suffers chronic back pain as a result of a back injury he sustained in April 2001.  R. 559-60.  On April 5, 2001, Claimant injured his back at work when his right

---

[1]Also referred to as a generalized tonic-clonic seizure, a grand mal seizure is "[a] generalized seizure characterized by the sudden onset of tonic contraction of the muscles often associated with a cry or moan, and frequently resulting in a fall to the ground. The tonic phase of the seizure gradually give way to clonic convulsive movements occurring bilaterally and synchronously before slowing and eventually stopping, followed by a variable period of unconsciousness and gradual recovery."  Stedman's Medical Dictionary (27th Ed. 2000).

foot slipped while he was pushing a bundle of steel. *Id.* Claimant continued to work until July 26, 2001, when he experienced more severe pain and other symptoms. R. 560.

At the hearing, Claimant leaned to one side because that position was most comfortable for him, but he was also shaking from muscle cramps, spasms, and "[n]erves going off." R. 560. Claimant also reported that he typically experienced sciatica.[2] R. 561. At the hearing, Claimant was experiencing swelling in his legs caused by blood clots. R. 571.

Claimant stated he cannot perform household chores nor work outside the home because he suffers from constant pain. R. 572. Claimant can only stand for fifteen to twenty minutes at a time, and he cannot walk more than two blocks at a time. R. 564. Sitting up straight for more than forty minutes can be painful, but he experiences relief when he is able to recline with his legs elevated. R. 564-65. He always holds onto the side of a chair when he sits to relieve pressure on his back. R. 565. While Claimant can lift a gallon of milk, he cannot carry it because of pain and muscle tightness. *Id.* He experiences some difficulty using his hands. R. 566. Claimant cannot stand long enough to cook or clean dishes. R. 568. He rarely goes grocery shopping, but when he does, he experiences muscle cramps and spasms. *Id.* He does not drive because of the spasms. R. 569. His friend, Cynthia Gill, lives with him and performs all household tasks. R. 568.

---

[2]"Pain in the lower back and hip radiating down the back of the thigh into the leg, initially attributed to sciatic nerve dysfunction (hence the term), but now known to usually be due to herniated lumbar disk compromising a nerve root, most commonly the L5 or S1 root." Stedman's Medical Dictionary (27th Ed. 2000).

On a typical day, Claimant watches television and takes medication. R. 569. Claimant claims he sleeps relatively well due to his medication, but sometimes he awakens in the middle of the night experiencing muscle spasms. *Id.* Rating his average pain level as a six out of ten, Claimant described some mornings as more difficult than others. R. 570.

Claimant received treatment from a number of doctors. R. 562. Claimant made progress when he was treated at the Northwestern Memorial Pain Clinic eight hours a day, five days a week. R. 563, 566, 589-90. Citing the pain management program as a positive experience, Claimant learned how to minimize his pain while performing household tasks and received physical and vocational therapy. R. 566. Claimant recalled having difficulty lifting objects. R. 567. Despite his progress in the pain management program, his back pain ultimately resumed after he placed a dish in his sink in September 2002. R. 562-63. Through the Loyola University Health System, Claimant received four rounds of epidural injections, the last of which provided him with pain relief for three days. R. 567.

Claimant suffers from depression, which is exacerbated by his seizure condition. R. 561. Specifically, he stated that his seizure condition prevents him from keeping a job because each time he has a seizure he loses his job and has financial difficulties. R. 561-62. Claimant also has suicidal thoughts.[3] R. 579-80. He underwent psychiatric treatment at his

---

[3]Claimant expressed several such statements during the hearing.
　　(1) On a typical day, Claimant states, he "[does not] have the energy to blow [his] damn brains out." R. 570.
　　(2) When the ALJ asked whether an increase in medication in advance of the holiday season helped his depression, Claimant responded: "I guess so. I haven't shot myself yet." R. 579. The ALJ then asked whether Claimant had thoughts of suicide, and Claimant responded as follows:
　　"Oh, yeah. Wouldn't you? Your whole life's over. You don't go any place. I might as well be in prison. . . . I'm dragging [Cynthia Gill's] life down the damn tubes just as fast as I did mine. . . ." R.

pain clinic around 2001 or 2002, but he only returned once after that period.  R. 579.  That last visit to a psychiatrist resulted in an increase in his dose of medication to help him deal with the depression he was experiencing as the holiday season approached.  R. 579.

In response to questioning by the medical expert, Dr. Daniel Girzadas, Claimant testified that, at the time of the hearing, he was taking Neurontin, Etodolac, Effexor, high blood pressure medications, Arthrotec 75, and Ibuprofen.  R. 584.  He explained he was not receiving treatment nor taking any medication for the blood clots in his right leg because he could not afford to do so.  *Id.*

Dr. Girzadas questioned Claimant regarding Dr. William McKenna's 2006 report to explore  Claimant's seizure disorder.  R. 584.  On January 20, 2006, the State sent Claimant to Dr. McKenna for a consultative examination.  *Id.*  In his report, Dr. McKenna indicated Claimant "has on rare occasions suffered grand mal seizures since the age of seven when he was struck in the head."  *Id.*  Claimant agreed that he now experienced "full blown grand mal" seizures about once every three to four years, but added that he had suffered seizures several times a year when he was younger.  *Id.*  Claimant denied losing consciousness during his seizures, stated he had taken Dilantin in the past, and explained he was taking Neurontin for his seizure disorder at the time of the hearing.  R. 585.  Claimant's last seizure occurred approximately one year and a half prior to the hearing.  R. 585-86.

Dr. Girzadas also questioned Claimant with regard to other aspects of his medical history.  R. 587.  Although Claimant had surgery on his left ankle, he was not receiving

580.

treatment of any kind for his ankle at the time of the hearing. *Id.* The most recent objective tests– in the form of x-rays or MRIs to diagnose his back condition–were performed in 2001. *Id.* Claimant has never used an assistive device to walk. R. 588.

### 2. Cynthia Gill - Witness[4]

Cynthia Gill ("Gill") lives with Claimant and sees him every day. R. 575. Gill explained that Claimant requires ten minutes of stretching before he can get out of bed and that, in general, Claimant "goes from the bed to the sofa to watch the television." *Id.* Claimant suffers from "vertigo," or seizures, which Gill describes as his eyes moving rapidly for a five- or ten-minute period during which he is not responsive. R. 576. Such episodes occur two or three times a month. *Id.* Although Claimant does not lose consciousness during these episodes, he seems "spaced." R. 578. Gill handles the cooking, cleaning, and laundry because Claimant cannot perform those tasks. R. 577. She testified that Claimant drives "once, twice a month if that" and that he has friends who "all come over to see him." R. 578.

### 3. Daniel Girzadas, M.D.[5] - Medical Expert (ME)

The medical expert ("ME"), Dr. Girzadas, an orthopedic surgeon, examined Claimant's file and was present throughout the hearing. R. 583. The ME reviewed the medical evidence and rendered findings regarding Claimant's three medical conditions.

_____

[4] The hearing transcript incorrectly identifies the second witness as Kenneth Henning at page 575, but the Court notes that the second witness was Cynthia Gill.

[5] The hearing transcript also incorrectly identifies the medical expert as Dr. Daniel Brizadous. R. 550-52, 583. The Court notes that the ALJ's references in her opinion to the medical expert as Dr. Daniel Girzadas are accurate. R. 21, 27. The Court's search using www.google.com revealed that there is a Dr. Daniel Girzadas, but there is no Dr. Daniel Brizadous.

First, Claimant suffered from a back condition as a result of an injury he sustained in April 2001.  R. 588.  Overall, the ME explained, "the impression was that he had a history of chronic low back pain [and] hip pain."  R. 591.  Although Claimant walked with short steps and had a side-to-side gait, he was able to bear his weight and did not need an assistive device. *Id.*  Second, Claimant had a history of depression and anxiety.  *Id.*  Third, and finally, Claimant had a history of a major motor seizure disorder occurring less than one of every three years.[6]  *Id.*

After discussing the findings in the record, the ME opined that, from a physical point of view, the record "would not substantiate meeting or equaling" a listed impairment.  R. 592. The ME then rendered his opinion that Claimant could lift, push or pull ten pounds, stand and walk for at least two hours in an eight-hour day, and sit for six hours in an eight-hour day with hourly breaks.  *Id.*  In addition, the ME reported that Claimant can occasionally use ramps and stairs, balance, squat, stoop, crouch, crawl and kneel.  *Id.*  The ME concluded that Claimant should avoid exposure to unprotected heights, hazardous moving machinery, and industrial vibration.  R. 592-93.  The ME explained he was assuming a work schedule of eight hours per day, five days per week when accounting for Claimant's medications.  R. 593.

### 4.    Julie Lynn Bose - Vocational Expert (VE)

The vocational expert ("VE"), Julie Lynn Bose,  reviewed Claimant's file and was

---

[6] The ME noted that "the only findings in the record [related to the seizure disorder] . . . are the consultative examination and there is no comment [in that examination] about incomplete [seizures]."  R. 593-94. The ME also  explained that the record did not mention any loss of bowel or bladder control, nor any loss of consciousness.  R. 594.  Instead, the record showed Claimant experienced an interrupted thought process for a short period of time.  *Id.*

present throughout the hearing. R. 595-96. The VE discussed Claimant's work history, which the ALJ described as "extensive . . . [and] of a very short duration." R. 596. The VE noted Claimant had reported thirty-seven jobs, fifteen to twenty of which were "most likely not" substantial gainful activity ("SGA"). *Id.* The VE testified that Claimant's past relevant work consisted of unskilled or semi-skilled jobs that were at the medium to heavy exertional level, but without transferable skills.[7] R. 596-97.

The VE was asked to assume an individual of Claimant's age, education, and work experience who was limited to sedentary work; needed to alternate between sitting and standing every hour; could not climb ladders, ropes, or scaffolds nor use foot or leg controls; could occasionally climb ramps and stairs and balance, stoop, kneel, crouch, and crawl; and should avoid unprotected heights, dangerous moving machinery, and industrial vibration. R. 598. The VE was also asked to assume that such an individual was also limited to simple, unskilled, routine, repetitive tasks. *Id.* The VE testified that such an individual could not perform Claimant's past work. *Id.* However, such a hypothetical individual could perform a range of sedentary, unskilled positions: food and beverage order clerk, bench assembler, and bench packer. R. 598-99. The VE eliminated production line positions from the bench assembler and packer categories because of the sitting, standing, and hazardous machinery

---

[7] The VE cited examples of Claimant's prior jobs that may have been SGA: warehouse packaging production position; chamfer operator; meat packer; painter; and grinder. R. 596-97.

restrictions.  *Id.*  The VE testified that 4,900 to 5,400 jobs[8] in the Chicago metropolitan area as an assembler and packer accommodated these hypothetical restrictions.  R. 599.  When asked to assume that the individual should not interact with co-workers, supervisors, and the public, the VE eliminated the food and beverage order clerk position.  However, the VE stated such a restriction "would not substantially reduce the manufacturing types of bench positions such as . . . assembler and packer."  *Id.*

The VE also stated an additional restriction against concentration and staying on tasks because of partial seizures did not affect the number of jobs she had targeted.  R. 599-600.  However, when Claimant's representative asked the VE to assume that an individual who required minimal contact with co-workers, supervisors, and the public also needed to use one arm to brace himself to sit comfortably, the VE stated such an individual could not perform any of the identified jobs.[9]  *Id.*  In response to the ALJ's inquiry, the VE stated the jobs she identified were consistent with information in the Dictionary of Occupational Titles. R. 600.

## C. Medical Evidence

### 1. Preliminary Treatment through Loyola University Health System

---

[8]The VE targeted 3,300 to 3,600 bench assembler and 1,600 to 1,800 bench packer positions.  R. 599.

[9]The Court notes that the hearing testimony is unclear at this point.  Specifically, Claimant's representative asked the VE whether her answer would change if she were to additionally assume an individual who needed to brace him or herself against walls or furniture to "get to the job."  R. 600.  The VE responded "Yes" (presumably indicating that this person would be able to perform the identified jobs).  *Id.*  The testimony proceeded as follows:
Q: Okay.  How would it change it?
A: it would – well, actually, I have it disabled, because –
Q: Right.
A: – the second half of that, it does add to it.
Q: Okay.  I have nothing further, Judge.

Claimant sustained a back injury at work on April 5, 2001. R. 559-60. Claimant continued working until July 2001, when he experienced a recurrence of more severe pain. R. 310. In July 2001, Claimant sought treatment through Loyola University Health System, where he was diagnosed with back pain secondary to strain and received conservative treatment and medication. R. 257-59, 262, 310. After returning to work, Claimant continued his treatment regimen with Loyola University physicians. R. 261-66. His examining physician noted tenderness in the L5/S1[10] area, but no other abnormalities. *Id.* Claimant did not work for a time during this period. *See* R. 266. An August 6, 2001 radiological report revealed mild degenerative changes at L5/S1 as well as degenerative changes in the lower thoracic spine.[11] R. 492; *see* R. 326, 418.

By September 2001, an orthopedic specialist advised continued conservative treatment and released Claimant to return to work on light duty. R. 266, 328-29. As of September 26, 2001, Claimant had attended twenty-one sessions of physical therapy through the RIC and was discharged with improvements and the goals of therapy achieved. R. 332. After returning to work, Claimant reported back spasms and numbness to a physician who advised against lifting or bending and referred him to the orthopedic clinic. R. 269. Subsequently, Claimant stopped working because of the pain. R. 310.

---

[10]L5 and S1 are medical shorthand for the fifth lumbar vertebrae and the first sacral vertebrae. Further references to specific vertebrae will be formatted in this fashion.

[11]Subsequently, January 2006 x-rays demonstrated that the L5/S1 disc spaces were adequately maintained, but that there was anterior degenerative spurring and anterior degenerative spondylosis at T11-T12. R. 454.

## 2. Dr. Alexander Ghanayem, M.D. – Chief, Division of Spine Surgery

A November 2001 physical examination by Dr. Ghanayem showed Plaintiff had a normal gait, normal posture, and no focal motor or sensory neurological deficits. R. 272. An MRI scan revealed mild disc dehydration with no signs of disc herniation[12]. R. 272-73. There were no indications of neurocompression, annular tears, nor disc herniation. *Id.* Claimant had normal ranges of motion of his lumbosacral spine, but Dr. Ghanayem noted tenderness in the region. R. 272. Dr. Ghanayem advised Claimant to visit the pain clinic for epidural injections, which provided temporary relief. R. 272-73, 310, 441, 567, *see* R. 274-75, 277, 282. Subsequent notes from Loyola University Health System physicians included essentially similar findings during repeated examinations.[13] R. 274-380.

## 3. Dr. Paul Lento, M.D. – Orthopedic Surgeon

On March 20, 2002, Dr. Lento examined Claimant and made a range of normal findings. R. 280-83. Although Dr. Lento observed some abnormalities on physical examination, he noted Claimant had overreacted with regard to tenderness. *Id.* He believed Claimant could return to work, although to a different, less manual type of position. R. 282. Dr. Lento sent Claimant to the chronic pain program at the RIC. R. 286; *see infra*, C.5. He also requested a functional capacity evaluation ("FCE"), which was performed in April 2002.

---

[12] Herniation is defined as "[p]rotrusion of an anatomic structure (*e.g.,* intervertebral disk) from its normal anatomic position." Stedman's Medical Dictionary (27th Ed. 2000). Disk herniation means the "extension of disk material beyond the posterior annulus fibrosus and posterior longitudinal ligament and into the spinal canal." *Id.*

[13] For example, in March 20, 2002 and July 16, 2002 reports, Dr. Paul Lento, M.D., an orthopedic surgeon, indicated that although Claimant suffered chronic low back pain, his neurological examination and range of motion in his spine were both normal. R.280-83, 286-87.

*See infra,* C.4.  On July 16, 2002, Claimant visited Dr. Lento upon conclusion of his treatment program at the RIC.  R. 286-87.  At this time, Claimant reported he was still experiencing some pain and spasms, but with significant functional improvements.  R. 286-87.

### 4.    Vincent Cesaro, P.T. – Physical Therapist

Vincent Cesaro, P.T., a physical therapist under the direction of Dr. Lento, treated Claimant and completed an FCE in April 2002.  R. 36-45.  Cesaro determined Claimant was capable of working at a very low level.  R. 36.  Although Cesaro indicated Claimant reported a very high level of pain, he noted Claimant had corresponding increases in heart rates.  *Id.* Cesaro concluded Claimant could sit for four to six hours, at 50 to 60 minute duration intervals; stand for one hour, at five to ten minute duration intervals; and walk for two hours, occasionally for moderate distances, during a typical work day.  R. 42.  Additionally, Cesaro found Claimant was able to lift 12.6 pounds above his shoulders, 14.8 pounds from desk to chair, and 19.2 pounds from chair to floor.  R. 43.  The therapist provided workday tolerance recommendations of six to seven hours.  R. 42.

### 5.    Rehabilitation Institute of Chicago ("RIC")

Upon Dr. Lento's recommendation, Claimant began a four-week pain management course of treatment at the RIC in April 2002.  R. 295-96.  When Claimant arrived at the center, RIC personnel observed that he was dramatizing his pain slightly.  R. 310.  RIC doctors also determined Claimant's MRI scan was significant for a bulging disc at L5/S1 and potentially an annular tear.  R. 311.  Aiming to improve Claimant's strength, flexibility, and tolerance for activity, treating sources characterized his participation as "great" and "full and active."  R.

13

295-96.

RIC doctors also provided some psychological treatment and performed a psychological examination. R. 313, 375-76. Claimant reported symptoms consistent with depression and anxiety. *Id.* The doctor indicated that Claimant's activity appeared to have decreased because he feared re-injury, which in turn increased pain, depression, and other symptoms. R. 376. Claimant did not see a psychiatrist or psychologist after this time. R. 579.

Claimant was functioning at a medium strength level at the conclusion of the program in June 2002. R. 296. Doctors discharged Claimant with instructions to take Effexor and to continue his exercise regimens. R. 295. Subsequent notes from Claimant's treating sources revealed that he had been seen on a rather infrequent basis following his discharge from the RIC. R. 46-52. Claimant continued to receive care on a periodic basis at RIC between 2003 and 2006[14], decreasing his visits to approximately once a year after 2003. R. 46-48, 51-52. Claimant lacked ongoing medical insurance and did not have Medicaid. R. 147, 156.

### 6.  Dr. P. Michelle Mueller, M.D. – RIC

Dr. Muellner of the RIC diagnosed Claimant with a pain disorder associated with

---

[14]In October 2002, the treating physician noted some normal findings and some abnormalities and increased Claimant's Effexor. R. 351. During a July 2005 examination, the treating physician at the RIC noted that Claimant needed light duty work. R. 46. In 2006, the RIC treating physician reported tenderness at L3, L4, and L5. R. 51. The physician also noted depression. R. 51-52. The March 13, 2006 report revealed that Claimant was last seen in the RIC in July 2005 with a history of degenerative disc disease, chronic low back pain, and myofascial pain syndrome. *Id.* Claimant rated his pain averages as ranging in severity from four to eight on a ten-point scale. R. 592. His neurological examination was again normal. *Id.* He was diagnosed with a history of degenerative disc disease, myofascial pain syndrome, vocational radicular pain with positive neurological tension signs, depression and insomnia. *Id.*

psychological factors and general medical condition, as well as adjustment disorder associated with mixed anxiety and depressed mood. R. 309. At the time of Claimant's discharge on June 28, 2002, he was reporting no pain and functioning at a medium exertion level. R. 357-58.

### 7. Dr. Lynn R. Rader, M.D. – Treating Physician

On June 13, 2006, Dr. Rader, Claimant's treating physician, noted that he reported constant pain radiating down his back and legs. R. 52. Dr. Rader's examination revealed a normal gait and a normal ability to flex and extend the lumbar spine. R. 51-52. Claimant was taking Effexor and Etodolac when he could afford to do so, looking for work, and exercising twenty minutes per day, which helped alleviate his pain. R. 51. Dr. Rader prescribed Neurontin as a sleep aid and for pain, and she encouraged him to continue to seek work. *Id.*

### 8. Dr. William McKenna – Internal Medicine Consultative Examiner

In January 2006, Claimant visited Dr. McKenna, an internist, for a complete examination at the request of the State Agency. R. 456-61. Describing Claimant as cooperative, Dr. McKenna noted Claimant exhibited pain upon moving about as well as emotional distress and depressed mood and affect. R. 458. Dr. McKenna made some normal findings neurologically and with regard to Claimant's back, but observed evidence of lumbar nerve root compression and some range of motion limitations. R. 459-60. Claimant was able to walk and bear his own weight fairly well without an assistive device. *Id.* Dr. McKenna believed Claimant had chronic back pain, which was most likely a result of degenerative disc disease and degenerative joint disease in the lumbar spine. R. 461. He noted Claimant had not taken seizure medication in years, and that his seizures were rare. *Id.*

### 9.    Dr. Erika Liljedahl, Psy. D. – Psychological Consultative Examiner

On January 20, 2006, Claimant visited Dr. Liljedahl at the request of the State Agency. R. 450-52.  Dr. Liljedahl evaluated Claimant's mental condition and diagnosed depressive traits. R. 450-52. She characterized Claimant as cooperative and a reliable historian who did not appear to exaggerate or deliberately feign responses.  R. 450.  Dr. Liljedahl used a clinical interview and a mental status examination as procedures during the visit.  *Id.*

Dr. Liljedahl reported a number of mental status findings, including Claimant's ability to remember objects upon immediate and delayed recall; his attention and concentration, such as digit recall; his knowledge of current events, and his social judgment.  R. 451-52.  Dr. Liljedahl concluded "[t]est data from [the] evaluation, behavioral observations, self report, and history are consistent with a pattern of past history of depression and a propensity toward depression because of his physical pain, although he did not meet the criteria for a full blown mood or anxiety disorder."  R. 452.

### 10.   Dr. Arjmand Towfig, M.D. and Dr. Frank Jimenez, M.D. – State Agency Physicians

On February 23, 2006, Dr. Towfig, a state agency physician, examined Claimant's medical records and deemed he was capable of performing light work, with no environmental or postural limitations.  R. 476-83.  On June 22, 2006, Dr. Frank Jimenez affirmed Dr. Arjmand's conclusions.  R. 484-85.

### 11.   Dr. Elizabeth Kuester, M.D. – State Agency Psychiatrist

On February 21, 2006, Dr. Kuester, a state agency psychiatrist, reviewed Claimant's records and determined Claimant did not have any severe mental impairments nor any

significant limitations due to a mental impairment. R. 462-75. She also concluded Claimant had mild limitations resulting from an affective disorder.[15] R. 462, 472.

### 12. Examining Physician at Oak Forest Hospital

Following the hearing, Claimant submitted additional records to the ALJ, R. 488-549, including December 2006 and January 2007 reports of visits to an examining physician at Oak Forest Hospital. R. 497, 504. The examining physician reported that Claimant exhibited no signs of weakness, rated Claimant's motor strength as normal (5/5), and observed that Claimant's strength leg raising tests were also normal. R. 497, 504.

## D. The ALJ's Decision - April 24, 2007

Following a hearing and review of the evidence on file, the ALJ rendered a decision denying Claimant's application for DIB and SSI. R. 18-29. The ALJ reviewed Claimant's application under the familiar five-step sequential analysis. *Id. See infra,* Part II.B (Disability Standard). At step one, the ALJ found Claimant had not engaged in substantial gainful activity since November 10, 2001, Claimant's alleged disability onset date. R. 23. At step two, the ALJ found Claimant had the severe impairments of degenerative disc disease, anxiety and depression. *Id.* At step three, the ALJ found Claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. R. 24. The ALJ then assessed Claimant's RFC, ultimately finding that Claimant has the RFC to perform sedentary work that accommodated

---

[15] Specifically, Dr. Kuester identified mild restrictions relating to activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. R. 472.

a sit/stand option and a variety of other postural, environmental and mental limitations.[16] *Id.*

In examining Claimant's RFC, the ALJ found Claimant's medically determinable impairments

could not reasonably be expected to produce the degree of limitations alleged by Claimant. R.

27. At step four, the ALJ found Claimant incapable of performing any past relevant work. R.

28. At step five, the ALJ concluded Claimant had the capacity to perform a significant

number of jobs in the economy as an assembler and packer. R. 28-29. Finally, the ALJ

concluded Claimant was not under a disability from November 10, 2001 through April 24,

2007, the date of the ALJ's decision. R. 29.

## II. LEGAL STANDARDS

### A.  Standard of Review

The "findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A decision by an ALJ becomes

the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v.*

*Apfel*, 530 U.S. 103, 106-07 (2000). Under such circumstances, the district court reviews the

decision of the ALJ. *Id.* Judicial review is limited to determining whether the ALJ applied the

correct legal standards in reaching his decision and whether there is substantial evidence in the

record to support the findings. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

---

[16]Specifically, the ALJ found Claimant could sit for six of eight hours during a typical workday;
stand or walk for at least two hours provided he had the opportunity to change position once every hours;
frequently lift and carry up to 10 pounds; occasionally climb ramps or stairs, balance, stoop, kneel, crouch
or crawl. R. 18-29. The ALJ also concluded Claimant could not climb ladders, ropes or scaffolds; he was
unable to operate foot controls; and recommended Claimant should avoid heights, moving machinery, and
industrial vibration *Id.* Finally, because of Claimant's depressive traits, the ALJ determined Claimant
was limited to the performance of unskilled, simple, routine and repetitive tasks that involve only minimal
interaction with the general public, supervisors or coworkers. *Id.*

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). A "mere scintilla" of evidence is not enough. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (quoting *Perales*, 402 U.S. at 401). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge between the evidence and the result." *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (quoting *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000)). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

A reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) (quoting *Lopez*, 336 F.3d at 539). It may not, however, re-evaluate the facts, "re-weigh [the] evidence . . . or substitute [its] own judgment for that of the Commissioner." *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards in reaching a decision and whether there is substantial evidence to support the findings. *Id.* at 368-69. The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

**B.     Disability Standard**

Disability insurance benefits ("DIB") are available to a claimant who can establish

"disability" under the terms of Title II of the Social Security Act. *Rice*, 384 F.3d at 365. An individual is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A disabled individual is eligible for DIB, however, only if she is under a disability. 42 U.S.C. § 423(a)(1)(E). An individual is under a disability if she is unable to do her previous work and cannot, considering her age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2)(A). Gainful employment is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

To make this determination, one must employ a five step sequential analysis. 20 C.F.R. §§ 404.1520(a)-(f). Under this process, the ALJ must inquire, in the following order: (1) whether the claimant is engaged in substantial gainful employment; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work in the national economy. *White v. Barnhart*, 415 F.3d 654, 657 (7th Cir. 2005). Once the claimant has proven he cannot continue his past relevant work because of physical limitations, the ALJ carries the burden to show that other jobs which the claimant can perform exist in the economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

### III. DISCUSSION

This case presents the following issues: (1) whether substantial evidence supports the decision of the ALJ that Claimant was not disabled; (2) whether the ALJ erred in considering testimony from the VE that was allegedly inconsistent with the DOT; (3) whether the ALJ was required to obtain objective psychological testing and a mental RFC assessment; and (4) whether the ALJ erred in concluding that Claimant could perform full-time work.

## A. Substantial Evidence Supports the ALJ's Determination That Claimant is Not Disabled.

In the instant case, substantial evidence supports the ALJ's decision that Claimant was not disabled and had the RFC for sedentary work.[17] The ALJ based her decision on Claimant's testimony as well as objective medical evidence and other evidence, and her RFC determination was consistent with the medical evidence of record.

The medical evidence provides ample support for the ALJ's determination. No treating physicians advised Claimant to stop working. Instead, a range of medical professionals recommended that Claimant could return to work at various levels of activity. For example, in September 2001, only five months after Claimant injured his back, an orthopedic specialist with Loyola University Health System ("Loyola") advised ongoing conservative treatment and released Claimant to return to work on light duty. Subsequently, a Loyola treating physician recommended that Claimant avoid lifting or bending at work. During a November 2001

---

[17]Sedentary work is work "that involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

examination of Claimant, Dr. Ghanayem, Chief of Loyola's Division of Spine Surgery, made normal findings and did not recommend any type of surgery.  Dr. Lento, an orthopedic surgeon, examined Claimant in March 2002, suggested that he participate in the RIC chronic pain program, and concluded that Claimant could return to work, although to a different, less manual position.  In June 2002, when Claimant had completed a course of treatment at the RIC, Dr. Mueller noted he was reporting no pain and was functioning at a medium strength level.

Subsequently, in July 2005, a treating physician at the RIC advised that Claimant was limited to light duty work.  Dr. Rader, Claimant's treating physician, made normal findings during a June 2006 examination, prescribed Neurontin as a sleep aid and for pain, and encouraged Claimant to continue to seek work.  Dr. McKenna, an internal medical consultative examiner, and Dr. Liljedahl, a psychological consultative examiner, both examined Claimant in January 2006 at the request of the State Agency.  Neither examiner placed any restrictions on Claimant's ability to work.  The State Agency physicians examined Claimant's medical records and determined he was capable of performing light work with some visual limitations.  Dr. Kuester, a State Agency psychiatrist, reviewed Claimant's records and found he did not have any severe mental impairments nor any significant limitations due to a mental impairment.  Dr. Girzadas, the ME, rendered his opinion that Claimant could lift, push or pull ten pounds; stand and walk for at least two hours in an eight-hour day; sit for six hours in an eight-hour day with hourly breaks; and occasionally use ramps and stairs, balance, squat, stoop, crouch, crawl and kneel.  However, Dr. Girzadas advised that Claimant should

avoid unprotected heights, hazardous moving machinery, and industrial vibration. After the hearing, Claimant submitted to the ALJ additional medical records from an examining physician at Oak Forest Hospital. Those records reported normal test results and indicated Claimant exhibited no signs of weakness.

The medical evidence, examined in its entirety, reveals a common finding among the doctors that Claimant could perform light or sedentary work. None of the doctors suggested Claimant was unable to work, and all of them indicated Claimant could, at the very least, perform the range of work allowed by the ALJ. Therefore, the Court finds substantial evidence supports the ALJ's finding that Claimant was not disabled and could perform sedentary work.

**B.      The ALJ Was Not Required to Discuss Provisions of the Dictionary of Occupational Titles ("DOT") That May Have Conflicted With the VE's Testimony.**

In her step five analysis, the ALJ relied on the VE's testimony that 3,300 to 3,600 bench assembler and 1,600 to 1,800 bench packer jobs were available for an individual with Claimant's set of limitations. Claimant argues that the VE's testimony conflicts with the DOT and that such conflicts should have been resolved by the ALJ pursuant to Social Security Ruling (SSR) 00-4p. The Commissioner contends that the ALJ is not required to reopen the record because the ALJ performed her duties by reasonably addressing the issue of consistency and because the VE's testimony was not inconsistent with the DOT.

Specifically, Claimant argues that both of the jobs cited by the VE exceed the level of

essentially sedentary, unskilled work the ALJ provided in her RFC.[18]  *See* SSR 83-10.   Citing

*Prochaska v. Barnhart*, Claimant also contends that this issue was not waived by Claimant's

failure to address the potential discrepancy at the hearing because there was an apparent, and

unresolved, discrepancy.[19]  454 F.3d 731, 735 (7th Cir. 2006).

The Commissioner counters Claimant's assertions in two ways.   First, the

Commissioner maintains that the ALJ adequately addressed the issue of consistency where she

asked the VE whether her testimony was consistent with the DOT; the VE replied that it was;

and Claimant's representative did not question the VE regarding the foundation for her

testimony.  Moreover, the Commissioner cited *McKinnie v. Barnhart* for the proposition that

ALJs may rely on "bottom line" testimony unless the claimant challenges the foundation for

that testimony.  368 F.3d 907, 911 (7th Cir. 2004).  Second, the Commissioner asserts that the

assembler jobs the VE identified correspond to titles in the DOT that are described as sedentary

work.[20]   Further, the Commissioner relies upon *Coleman v. Astrue* for the proposition that

[18]According to the DOT, Claimant contends, the bench assembler position is light in exertional level.  DOT § 706.684-042.  Claimant also maintains that the DOT does not identify a "bench packer" job, and therefore directs this Court's attention to the job of "packager, hand," which Claimant surmises to be the type of job that the VE had identified.  R. 598-99; DOT § 920.587-018.  The "packager, hand" position is medium in exertional level.  DOT § 920.587-018.

[19]While Claimant relies upon *Sears v. Bowen* to suggest strict legal requirements can be applied less stringently where, as here, the claimant was represented at the hearing by a non-attorney, *Sears* is distinguishable.  840 F.2d 394, 400 (7th Cir. 1988).  An ALJ is entitled to presume that a claimant represented by counsel in the administrative hearings has made his best case, but this "does not necessarily hold true when a claimant is represented by a nonlawyer."  *Id.* at 402.  In *Sears*, the claimant's non-attorney representative "did little beyond requesting that the record be kept open for an additional [medical] report . . . and did not question Sears at the hearing."  *Id.*

[20]Claimant refutes the Commissioner's suggestion of four assembler jobs that are sedentary, maintaining that, first, the VE referred to a specific assembler job, bench assembly (DOT 706.684.042); and second, that the VE selected bench assembly in response to the ALJ's specific hypothetical requiring unskilled, simple, routine, and repetitive tasks.  Thus, Claimant argues, two of the four jobs the

errors related to SSR 00-4p and DOT inconsistencies are harmless when a significant number of other jobs not inconsistent with the DOT remained available. No. 07-1729, 2008 WL 695045, *5 (7th Cir. Mar. 14, 2008). Thus, the Commissioner emphasizes, even accepting Claimant's argument that "bench packer" jobs are not identified in the DOT, the errors were harmless because 3,300 to 3,600 assembler positions remain available–a range that represents a significant number of jobs.

SSR 00-4p explains that "[w]hen there is an *apparent* unresolved conflict between [the] VE . . . and the DOT, the [ALJ] must elicit a reasonable explanation for the conflict before relying on the VE . . . to support a determination or decision about whether the claimant is disabled." (Emphasis added). Thus, it is evident that the conflict must be apparent. The Seventh Circuit has emphasized that the ALJ is not required to resolve discrepancies between the VE's testimony and the DOT[21] unless the discrepancy was made known at the hearing. *Donahue v. Barnhart*, 279 F.3d 441, 446-47 (7th Cir. 2002). In *Donahue*, the Seventh Circuit interpreted SSR 00-4p as requiring the ALJ to "'[e]xplain [in the decision] how any conflict [with the [DOT]] that *has been identified* was resolved." *Id.* at 446 (quoting SSR 00-4p). "The ruling requires an explanation only if the discrepancy was 'identified'–that is, if the claimant (or the ALJ on his behalf) noticed the conflict and asked for substantiation." *Id.* at 446-47.

The Seventh Circuit subsequently explained that the ALJ "*has an affirmative*

_____

Commissioner suggested are semi-skilled, and the four jobs, in any event, do not necessarily accommodate Claimant's limitations.

[21]The Social Security Administration has taken "administrative notice" of the DOT. 20 C.F.R. § 404.1566(d). The ALJ can also rely on testimony from the VE. 20 C.F.R. § 416.966(e); SSR 00-4p.

*responsibility* to ask about any possible conflict between [VE] evidence and information provided in the DOT." *Prochaska*, 454 F.3d at 735. This duty requires the ALJ to ask the VE if the evidence she has provided conflicts with the DOT. *Id.* If there is an apparent unresolved conflict, then the ALJ must obtain a reasonable explanation for the apparent conflict. *Id.*

In this case, the ALJ performed the required inquiry. Following the exchange of hypotheticals among the ALJ, the VE, and Claimant's representative, which are recounted in detail above, the ALJ asked the VE, "The jobs that you have identified are consistent with those found in the Dictionary of Occupational Titles?" R. 600. The VE replied, "Yes." *Id.* The hearing then concluded, at which time the ALJ stated that she would hold the record open for thirty days to allow Claimant's representative to submit any additional evidence regarding Claimant's physical impairments. R. 601.

As Claimant admits, no discrepancy was identified before the ALJ at the hearing. The ALJ asked the VE if her targeted jobs conformed to the DOT, the VE said they did, and Claimant's representative did not ask any follow-up questions to explore any potential conflicts. However, now citing examples of conflicts between the VE and the DOT, Claimant argues before this Court that the ALJ was required to address the apparent, and unresolved, discrepancy. This Court disagrees. Because any potential conflicts between the VE's testimony and the DOT were not identified at the hearing, the ALJ appropriately relied on the VE's testimony.

The case law is clear; any conflict must be identified before the ALJ. *Donahue*, 279 F.3d at 446-47. Because no discrepancies were brought to the ALJ's attention, the ALJ was

not required to resolve any. "Raising a discrepancy only after the hearing . . . is too late. An ALJ is not obliged to reopen the record. On the record as it stands–that is, with no questions asked that reveal any shortcomings in the vocational expert's data or reasoning–the ALJ was entitled to reach the conclusion she did." *Id.* at 447. Moreover, "[w]hen no one questions the vocational expert's foundation or reasoning, an ALJ is entitled to accept the vocational expert's conclusion, even if that conclusion differs from the [DOT's]–for the [DOT], after all, just records other unexplained conclusions and is not even subject to cross-examination." *Id.* at 446.

Compelling policy considerations also support the Court's conclusion. In a case such as this one, where a discrepancy between the DOT and the VE's testimony was not identified at the hearing, an ALJ fulfills her affirmative duty by asking about any possible conflict between the VE's evidence and the DOT. SSR 00-4p. In this respect, SSR 00-4p reasonably permits an ALJ to assume that a VE who testifies under oath that her testimony is consistent with the DOT is telling the truth. In the absence of questioning regarding the VE's foundation or reasoning, the ALJ was entitled to accept the VE's conclusion. Indeed, it would place a tremendous burden upon an ALJ to require a detailed inquiry in a case in which a discrepancy is not evident at the hearing.

This result is also consistent with the non-adversarial nature of Social Security hearings. Because VEs play a non-adversarial role, the concerns inherent in examining the testimony of retained experts in other types of cases are not applicable. A VE is "free to give a bottom line, provided that the underlying data and reasoning are available on demand." *Donahue,* 279 F.3d

27

at 446.  As *McKinnie v. Barnhart* explained, this facilitates cross-examination and testing of the VE's reliability.  368 F.3d 907, 911 (7th Cir. 2004).

The Seventh Circuit recently emphasized the obligation to strike an appropriate balance between the needs of the claimant to effectively cross-examine the VE and the needs of the SSA to hold efficient hearings.  *Britton v. Astrue,* 521 F.3d 799, 804 (7th Cir. 2008).  In *Britton*, the court noted: "[W]e refuse to endorse a system that drags out every Social Security hearing to an interminable length.  We encourage ALJs and the Social Security bar to cooperate in such a way that makes data underlying VE testimony available on demand without making every hearing impossibly long."  *Id.*

To this end, courts have recommended a range of options a claimant's representative can employ to  verify that the job titles cited by a VE correspond with the descriptions set forth in the DOT.  For example, a claimant's representative is free to ask the VE to provide the relevant DOT citations; if the VE does not do so, the result is likely to be a remand.  *See McKinnie,* 368 F.3d at 911 (data underlying VE's testimony was not "available on demand" where VE testified that her figures were based on government statistics and her own surveys but had not prepared a report, did not bring any materials to the hearing and could not provide citations to the materials on which she relied and ALJ told claimant's attorney that VE could refuse to compile her data unless claimant compensated her for her time).  A claimant's representative who does not have adequate time to refer to the DOT during the VE's testimony can request a brief recess or time to supplement the record after the hearing.  *Britton,* 521 F.3d at 804 (suggesting additional methods a claimant may use to challenge a VE's testimony).

Because the discrepancies on which Claimant now relies were not mentioned at the hearing, the ALJ was not required to address them.

## C. The ALJ Was Not Required to Obtain Additional Psychological Testing Nor a Mental RFC Assessment.

In her decision, the ALJ found that Claimant had severe psychological impairments, depression and anxiety, which caused Claimant to experience limitations. The ALJ acknowledged that there were no medical source statements indicating significant mental limitations and that the State Agency mental health professionals opined that Claimant did not have a severe mental impairment. R. 23-24. However, she noted the psychological consultative examiner's finding that Claimant exhibited depressive traits, and she decided Claimant's psychological limitations were "readily apparent." R. 23-24. Specifically, the ALJ relied upon her observations of Claimant during the hearing to conclude that he would have difficulty performing work that would require significant interpersonal interaction and the performance of detailed or complex tasks.

Claimant does not dispute the presence of psychological impairments that cause limitations. Instead, Claimant argues the ALJ erred in failing to obtain objective testing and a mental RFC to determine the actual impact of those impairments. Specifically, Claimant maintains the ALJ erred in three respects. First, the ALJ failed to satisfy her obligation to develop a full and fair record because the consultative psychological examination did not include objective testing, which was required to clarify the extent of Claimant's limitations and

their impact on his RFC.[22]  Second, the report of the consultative examiner, Dr. Liljedahl, should have included an RFC assessment.[23]  Third, because the ALJ is not a mental health professional, she could not assume the nature and extent of Claimant's limitations.[24]

In contrast, the Commissioner argues that the ALJ did not err because Claimant bears the burden of providing evidence of his impairments, and that the ALJ reasonably believed the record of Claimant's mental condition was complete.  Further, the Commissioner maintains that Dr. Liljedahl's report did contain objective test data, and that no medical sources, including Dr. Liljedahl, placed any restrictions on Claimant's mental functioning.  In sum, the Commissioner contends, the ALJ's reliance on her own observations of Claimant as part of her analysis of the entire record was an appropriate means of formulating her RFC finding.

When the evidence before the ALJ suggests a mental impairment, the ALJ has a duty

---

[22]At oral argument on September 10, 2008, Claimant explained that "objective testing" includes a battery of psychological tests, such as the Minnesota Multiphasic Personality Inventory ("MMPI").

[23]With respect to the elements of a complete consultative examination, the regulations instruct as follows: "Although [the SSA] will ordinarily request, as part of the consultative examination process, a medical source statement about what [a claimant] can still do despite [a claimant's] impairment(s), the absence of such a statement in a consultative examination report will not make the report incomplete."  20 C.F.R. § 404.1519(n)(c)(6).  Further, the regulations provide that "[the SSA] users] medical sources . . . to provide evidence, including opinions, on the nature and severity of [a claimant's] impairments. . . . [The final responsibility for deciding these issues is reserved to the Commissioner."  20 C.F.R. § 404.1527(e)(2).

[24]While Claimant relies upon *Bailey v. Barnhart* for the proposition that an ALJ cannot use her own judgment in assessing the impact of a claimant's psychological impairments, *Bailey* is distinguishable.  473 F.Supp.2d 822, 838-43 (N.D.Ill. 2006).  In *Bailey*, the ALJ explicitly rejected the available medical record upon which to base an RFC assessment and was therefore required, on remand, to "flesh out" what she needed to support her decision.  *Id.* at 838-39.  Further, the ALJ failed to address the effect of claimant's mental capacity on her ability to work.  Id. at 839.  Specifically, the VE indicated that claimant's inability to concentrate and adhere to a schedule would preclude work, but the ALJ failed to address this issue in her opinion and failed to ask the VE important questions about claimant's documented speaking limitations and abilities to function in a daily work environment. Id. at 839, 841-42.

to develop the record by inquiring into the present status of the impairment and its possible effects on the claimant's ability to work. *See Stambaugh v. Sullivan,* 929 F.2d 292, 295 (7th Cir. 1991). However, as the Seventh Circuit has remarked, "it is always possible to do more. How much evidence to gather is a subject on which district courts must respect the [Commissioner's] reasoned judgment." *Kendrick v. Shalala,* 998 F.2d 455, 458 (7th Cir.1993). "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Binion v. Shalala,* 13 F.3d 243, 246 (7th Cir. 1994). After all, it is the claimant, not the ALJ, who bears the burden of presenting medical evidence of an impairment, which means that the claimant bears the risk of uncertainty. *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008); *Luna v. Shalala,* 22 F.3d 687, 693 (7th Cir. 1994) ("[I]t was [the claimant's] duty, under 20 C.F.R. § 404.1512(a), to bring to the ALJ's attention everything that shows that he is disabled.").

Judicial review of administrative decisions is deferential, and the authority of administrative officials to decide how much evidence is necessary in a given case must be respected. *Kendrick,* 998 F.2d at 458. Further, as the Seventh Circuit instructs, a significant omission is generally required in order to conclude that the ALJ failed to fully and fairly develop the record. *Luna,* 22 F.3d at 692 (citing *Thompson v. Sullivan*, 933 F.2d 581, 586-88 (7th Cir. 1991) (case remanded where ALJ overlooked *pro se* claimant's physical and psychological impairments, relied upon medical records from three years ago while essentially ignoring all other evidence and testimony, failed to consider the effects of alcoholism despite a diagnosis of chronic alcoholism, and failed to order additional x-rays to determine the extent

31

of degeneration of claimant's spine when the last x-rays were taken nine years ago)).

The assessment of a claimant's RFC is a legal determination reserved to the SSA. *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995) (citing 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2)). When assessing what a claimant can do despite his limitations, the ALJ must consider the entire record, including all relevant medical and nonmedical evidence, such as the claimant's own testimony. *Diaz*, 55 F.3d at 306 n.2 (citing 20 C.F.R. § 404.1545(a); 20 C.F.R. § 416.945(a)). Within this framework, the ALJ considers the claimant's ability to meet physical, mental, sensory, and other requirements of work. 20 C.F.R. § 404.1545(a)(4). An ALJ cannot find a severe mental impairment and then fail to include any limitations based on the impairment in the RFC. *Lechner v. Barnhart*, 321 F.Supp.2d 1015, 1036 (E.D.Wis. 2004).

In this case, the ALJ examined all of the relevant areas, sufficiently developed the record, and reasonably believed that the record was complete. Prior to the hearing, the SSA obtained medical and treatment records from Claimant's physicians and also ordered a psychological consultative examination. At the hearing, the ALJ included Claimant's psychological limitations in her hypotheticals to the VE, as well as in her RFC finding, and elicited detailed testimony from Claimant. In addition, the ALJ left the record open following the hearing to obtain additional medical evidence related to Claimant's physical impairments.

Significantly, as Claimant acknowledges, the ALJ accounted for the medical and nonmedical evidence and gave Claimant the benefit of the doubt by including specific limitations in the RFC to address his mental limitations. Indeed, this is not a case in which the ALJ found a mental impairment to be severe, but failed to include any limitations in the RFC

based on the impairment. To the contrary, the ALJ limited Claimant's ability to work based on the severe mental impairment by explaining that Claimant's depressive traits limited him to unskilled, simple, routine and repetitive tasks that involve only minimal interaction with the general public, supervisors or coworkers. The ALJ considered all relevant evidence pertaining to Claimant's mental condition and included limitations in the RFC to tip the scales in Claimant's favor in terms of his capacity to perform work. This decision was supported by the entire record, including Claimant's testimony. As described above, Dr. Liljedahl, the psychological consultative examiner, conducted a clinical interview and a mental status examination, reported a number of mental status findings and "test data," and concluded that Claimant exhibited depressive traits. Similarly, Dr. Kuester concluded that Claimant did not have any significant limitations due to a mental impairment. The ALJ also reasoned that "the evidence did not establish marked restriction of activities of daily living, marked difficulties in maintaining social functioning, [nor] marked difficulties in maintaining concentration, persistence, or pace." R. 24. Overall, the ALJ fulfilled her duty to examine the entire record and assign restrictions. Indeed, it is difficult to imagine what more the ALJ could have done.

In sum, this Court finds there was no need for the ALJ to investigate any further. The ALJ based her decision about the effects of Claimant's mental condition on a sufficiently developed record, and her determination was supported by substantial evidence.

**D.    The ALJ Properly Determined That Claimant Could Perform Full-Time Work.**

Claimant argues the ALJ erred in concluding that Claimant could work, in light of the physical therapist's functional capacity evaluation ("FCE") that included a workday tolerance

recommendation of six to seven hours per day. R. 42. Specifically, Claimant contends, because the ALJ appeared to have accepted the FCE's other conclusions, the decision should have explained the conflict between the workday tolerance recommendation and the ALJ's decision that Claimant could work. In contrast, asserting the therapist did not limit Claimant to only part-time work, the Commissioner counters that the record supports the ALJ's RFC indicating Claimant can work full-time.[25] This Court agrees with the Commissioner's position.

When rendering a decision, the ALJ must build a logical bridge from the evidence to her conclusion. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). To this end, the ALJ must "sufficiently connect[] the dots" between a claimant's impairments, supported by substantial evidence in the record, and the RFC. *Young v. Barnhart*, 362 F.3d 995, 1002-03 (7th Cir. 2004). However, an ALJ is not required to include a "complete written evaluation of every piece of testimony and evidence." *Diaz*, 55 F.3d at 308.

In this case, the record supports the ALJ's conclusions that Claimant is capable of working on a full-time basis. It appears to this Court that the ALJ adopted the ME's opinion in reaching this conclusion. In her decision, the ALJ explained that the ME opined that Claimant had adequate functional capacity to engage in the work-related activities described in the RFC. R. 27. The ME explicitly stated that he was considering Claimant's capacity to work an eight-hour day. R. 592-93; *see supra*, Part III.A. Further, the ALJ's decision includes

_____

[25]SSR 96-8p provides that a claimant's RFC "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 61 Fed.Reg. 34,474, 34,475 (1996).

a range of other more recent evidence that does not limit Claimant to less than full-time work. For example, the ALJ reasoned that the State Agency medical advisors opined that Claimant could perform light work on a full-time basis, noting their finding that Claimant could "stand[,] walk or sit for six of eight hours." R. 27. In sum, aside from the workday tolerance recommendation in the FCE, the record does not contain any indication that Claimant is unable to work on a full-time basis.

While the ALJ did not explicitly state her reason for discounting Claimant's physical therapist's workday tolerance recommendation, it was not necessary for her to do so in this case. This is not a case in which the ALJ failed to evaluate any of the evidence that potentially supported Claimant's position. *See Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (citing *Brindisi ex. rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) (criticizing ALJ's failure to discuss conflicting evidence at Step 3 inquiry including the strongest piece of evidence supporting claimant's case)). Instead, when the April 2002 FCE is viewed in the context of the entire record, it is clear that substantial evidence exists that is both contrary to and more recent in time than the workday tolerance recommendation. As discussed above, the record includes a range of uncontroverted evidence of Claimant's ability to work for eight hours a day, five days a week. When the ALJ examined the opinion evidence, she explicitly stated that the FCE "back in April of 2002 was consistent with a functional capacity for at least sedentary work." R. 27-28. The ALJ also noted Claimant was functioning at a medium level in June 2002, shortly after the physical therapist performed the FCE at issue. R. 28. Overall, the ALJ's analysis demonstrates that the FCE was appropriately considered in the context of

the entire record and that it is reasonable to infer that the ALJ viewed a range of other evidence as superseding the workday tolerance recommendation.

In sum, this Court finds that a single stray comment in a record that is otherwise replete with evidence demonstrating Claimant's ability to work full-time is not a basis for remanding.

## IV. CONCLUSION

The Court finds the following: (1) substantial evidence supports the ALJ's determination that Claimant is not disabled; (2) the ALJ was not required to discuss provisions of the Dictionary of Occupational Titles that may have conflicted with the VE's testimony; (3) the ALJ was not required to obtain additional psychological testing nor a mental RFC assessment; and (4) the ALJ properly determined that Claimant could perform full-time work. **For the reasons set forth in this opinion, the Court denies Claimant's motion to reverse the final decision of the Commissioner of Social Security and grants the Commissioner's motion for summary judgment and affirms the Commissioner's decision that Plaintiff was not disabled.**

**SO ORDERED THIS 23rd DAY OF SEPTEMBER, 2008**

_Morton Denlow_

**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies sent to:**

| | |
|---|---|
| M. Jacqueline Walther | Jack Donatelli |
| Kielian and Walther | Assistant United States Attorney |
| 33 West Jackson Blvd. | 219 South Dearborn Street |
| Suite 201 | Suite 500 |
| Chicago, IL 60604 | Chicago, IL 60604 |

Counsel for Claimant                    Catherine A. Seagle
                                        Assistant Regional Counsel
                                        Social Security Administration
                                        200 West Adams Street
                                        Suite 3000
                                        Chicago, IL 60606

                                        Counsel for Defendant